May it please the Court, my name is Wendy Holton and I represent Troy McGarvey. Troy McGarvey is serving a hundred and ten year sentence based on the testimony of Robert Armstrong and Stan Edwardson that on July 10th 2001 he told him that he had shot and killed Cliff Grant and Norman Nelson. Neither made this assertion till long after the fact, after both of them had affirmatively denied that they heard anything. After the details had been published in the newspapers, not until Armstrong needed to deal from the prosecution, not until Rod Monroe had been arrested and said that he had heard this alleged confession and had asked his partner in crime Stan Edwardson to say that he had heard it and to include him in the people who had for a benefit from prosecution. And at that time after Rod Monroe had had done that for the only time in six pretrial statements by Armstrong and the second by Edwardson, both of them said that they had heard this confession, alleged confession, and that Monroe was there to hear it. Now we're not here to determine you know his guilt or innocence, that was a jury's function. I think we're here to determine evidence that was suppressed that would have had a different outcome on whether the Montana Supreme Court applied the proper standard from the Supreme Court. So you want to address each each of the three individuals who we're here to consider? Certainly. As you know the defense theory at trial, the three the third with the third individual I think that you're referring to is Saul Tony Sanchez. Yes. Who was. Well that was the first I was thinking but you put him at the end that's fine. Start with Armstrong maybe. Okay with Armstrong the the decision of the Montana Supreme Court is erroneous because not only did they impose upon the defense a due diligence standard. Yeah well I think that the government concedes that. Right. Okay. My difficulty with that, let me just get you right to the point because our time is is limited. My concern is what difference it could have made because the strongest evidence in your clients favor actually was in front of the jury that he had a cast on his arm, that he was at work that day, and a very strenuous cross examination of Armstrong. And given Fox's bias, I guess I have a hard time seeing how that extra information would have made any difference and if you can talk about that. Well the extra information there the in Turner the United States Supreme Court held that or stated that where the evidence is is thin as it was in this case just the one more thing to get it over over the hump. And here I don't see that that's what I mean in theory but I just in practice in this trial I don't see how it could have mattered. Or put another way I find it amazing that they convicted him but what difference would it have made? I think I think it would have made a huge difference I mean since I've been working on this case I mean I will say my my thought is oh let me at it if I could try this case it would be so much different. But the fact of the matter is that there were lots of things to impeach Armstrong but what gave him credibility was his mother's testimony that oh he came to me and he felt so bad about this but what this would have done it not only would have been another nail in Armstrong's credibility coffin it would have been a nail in Susan Fox's credibility coffin because it would either show that she was misrepresenting in this trial his competence or that she was willing to lie in another proceeding that he was not competent so what it would have done is. Did she testify to his competence? I mean she testified that he she he he came to her and said what? That he came to her and said that he had heard this but what he had wanted was to move and he was also interested in the Crimestoppers reward money but then she reported to Crimestoppers anonymously they later traced back to her but she was presented at trial for the sole purpose of bolstering Armstrong's credibility on this issue. I read both her testimony and the jailhouse notes as introducing a different theory for the defense that is a theory that he's not a liar a drunk and a manipulator etc but he's also now mentally incapable of doing that and he seems they they would they would undermine his main theory to to impeach him because he's a liar and then also say that he's mentally incompetent. Well at the trial that that is not inconsistent with what the defense was arguing at trial. At trial the defense asked him on cross-examination and emphasized that he was he had been drinking all day that day. They talked to Edwardson about him being half half lit and they argued that in the closing statements. So what they were not only relying on his lack of veracity and his willingness to lie to get what he wanted they were also relying on his ability to perceive and communicate. Isn't part of the problem here that the notes sort of supports his manipulation? I mean the notes seem to demonstrate that he was trying to figure out you know what scam to run pretty much. So they don't demonstrate that he wasn't competent. No and that's what and I think it's actually more likely that the notes and Susan Fox's testimony would the more likely result of both of that of those things would be that you would show that they were both were manipulative liars. That they would lie to get what they wanted at any time in any place. So to me that's more that that they were planning that whole thing that her in his sentencing hearing and him also for the purposes of getting what he wanted legally. Do you want to talk about the other county issue? Yes. I think actually that going in thing that I'd like to know is that there was a joint task force on drugs. Right? Yes. Do we know anything about how it was structured? How it worked, etc.? Well I think that the state's brief actually sets that out better than I did. And one thing that as I was preparing for this oral argument that we have not pointed out to the court before that is part of the record is that one of the investigating officers on this case, Brad Parrish, was a member of that task force. And that you can find that at the excerpt of the record on our website. Number five, page four, and in the trial transcript at page 591 and 627. That would go to the Sanchez piece, right? Yes. Okay. Yes. And wouldn't it have been cumulative? No. Cumulative, I'm sorry, Your Honor. In the sense that he's already been shown to be a violent person? There is no, Your Honor, there is absolutely no evidence in the entire trial that Tony Sanchez had any tendency to be violent. So this would have been a new piece? Absolutely. And as to his drug dealing, there was some evidence that he was a minor drug dealer. He, in fact, he was allowed to testify falsely that he was bringing in personal use amounts for Cliff Grant when Mary Leptich was clear. What difference would that have made to his possible culpability? I mean, all of this is only pertinent if you think about he might have been the murderer, right? Or that he, through the Mexican mafia, was the murderer. The evidence... A different defendant theory. Right. I mean, what Mary Leptich said was that he used private men to collect his debts. And so, she didn't directly say that he was the one, that he would have been the one who beat up Barney Salloway, but that he had other people do it for him, and he came off as this really nice guy. But back to the... Should I return to the issue of the connection between the task force and... Yeah, I would like that. It seems to me, I mean, the government's theory seems to be that the limitations on the police, the prosecutor's responsibility for the police is only for police who are working on this case. And I don't think, at least as it's usually applied, if this was a drug detective for this county, the detectives would be responsible. Even if they weren't assigned to this case. Is that right? They were. And I... They were what? As set out, frankly, in the State's brief, the Flathead County detectives working on this case specifically contacted the task force regarding whether they had any information on Cliff Grant. They searched, the task force had searched Mr. Rodriguez's trailer that was located on Mr. McGarvey's property. That the task force had provided Flathead County with information regarding a Mr. Winger. That Lake County had... Somebody from the Lake County part of the task force had actually contacted the Flathead County Sheriff's... The Flathead County part of this, which must have included Brad Parrish, and said the Tony on Grant's answering machine might be Saul Sanchez, and gave him... Gave them the phone number. So, therefore, that person knew enough about the case to know that. Exactly. That they had investigated Mary Leptich and determined that Sanchez was her supplier. Leptich had given significant information regarding Sanchez and his operations, and the amounts of drugs, about two pounds a month coming into Montana, and his violent collection techniques. So what is the relevant... Now we have an answer problem. What's the relevant clearly established Supreme Court law? Kyle's, Your Honor. Kyle's does not say, does not limit it to a county. Kyle's is a rule that states specifically, it is the prosecutor's duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police. It does not say from this investigative agency only. Kyle would say this task, the Lake County part of the task force was operating on their behalf because they called them. They seemed to be getting inside information, and they called them with critical information, and they had more information. Yes. And in fact, the Flathead, based on that information, the Flathead County detectives traveled to Lake County and interviewed both Sanchez and Leptich, although they didn't keep any records in particular of their conversation with Ms. Leptich. Counsel, you argued these same issues to the Montana Supreme Court, and they rejected your arguments. So our job isn't to look anew at your arguments. It's to determine whether the Montana Supreme Court's analysis was unreasonable. And so what specifically, in the opinion, in your view, is unreasonable? The Montana Supreme Court said neither Flathead County or the, basically, the Montana Supreme Court said Flathead County had no reason to know of Leptich or Ms. Matz. And they weren't charged with that. Well, they did know of Leptich. They certainly did know about Ms. Leptich. And willful blindness. Where is this in the Montana Supreme Court? Pardon? Where is this in the Montana Supreme Court opinion? It is all, the portion of the Montana Supreme Court's case that deals with this is in the first four pages of it, I believe. They also, I think, said to the extent that things weren't done, it was negligent and that doesn't count. They basically said it would have been inadmissible, which is an incorrect factual determination, because Mr. Sanchez clearly could have been cross-examined on the amounts of drugs that he was being in and his collection techniques. And they also made this argument, I believe, that the evidence would have contradicted the chosen strategy that counsel had selected. I don't think that they made that argument on the Sanchez materials. I think they only made that, that was on the Armstrong materials, yes. It's the only, the Montana Supreme Court opinion says that the relevant evidence concerning Sanchez and the murders that was claimed to be withheld was the Leptich interview and the Mets police report. Is that it? Well, it's also the Sanchez materials that the task force developed. Which, where he said, oh, I was bringing in two to four ounces a month. And did you make that argument to the Montana Supreme Court? Or is that a new thing you're telling us now? It was part of the record. I'm not sure that I made that specific argument. The other... Two to four ounces a month? That's what Sanchez says. The other thing that Sanchez said in his... That's what Sanchez told the task force. He also told the task force, though, that he was supplying Cliff Grant, which... How would that have made a difference in the outcome of the case? The outcome of the case? Sanchez was allowed to portray himself as this friendly migrant worker who's had his family, who was in Montana, to pick cherries. And that he really made his living making, as a logger. When really, he was selling two pounds of methamphetamine a month and was using violent collection methods. And there was evidence in this, the discovery in this case, and that was more developed at the evidentiary hearing, that Cliff Grant owed the Mexican Mafia as much as $20,000. What did he testify about at trial? Mr. Sanchez? Mr. Sanchez testified that he was at the gate to Mr. Grant's property, that he and his nephew, Arnaldo, and the other piece of Mary Leftich's testimony or evidence was that Arnaldo was with him to collect debts. But that they went to... That they were at Mr. Grant's property to pick up a couple of jet skis, and that McGarvey was at the property at that time. Okay. And that's not really in debate, whether McGarvey was at the property. It is not. Counsel, you've exceeded your time, but we'll give you a minute for about a few questions. Thank you, Your Honor. May it please the Court, my name is Mike Wellenstein, and I'm an Assistant Attorney General for the State of Montana. McGarvey is not entitled to any habeas relief under AETPA because he's failed to show that the Montana Supreme Court's decision denying his Brady claims was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. McGarvey has also failed to show that the Montana Supreme Court's factual determinations were unreasonable in light of the evidence presented in the state court proceedings. Now, the first Brady claim I'd like to deal with is the one involving Sanchez that the Court's interested in. Did the Montana Supreme Court rule that Brady doesn't apply to that? Brady does not... Apply because it was a different county. Did they say that? Did the Montana Supreme Court... The Montana Supreme Court said that McGarvey failed to show that the Flathead County prosecutors knew of or had reason to know of the information in the left-edge reports and left-edge interviews, excuse me, and the St. Ignatius Police Report. And that finding is not unreasonable. There's nothing in the record showing that anyone in Flathead County was aware of what went on in the left-edge interviews. Why does it have to be somebody in Flathead County? I mean, it's a little odd, first of all, the actual sentences. The state was unaware. Well, first of all, Lake County is part of the state. But second of all, there was a joint task force. And the people in Flathead, in Lake County, obviously knew enough about this case to make this key telephone call saying, that's Tony. And I gather one of the people working on this case for Flathead County was a member of the task force. To respond about the counties, I mean, we're all called the state, but counties handle their prosecutions differently. They're not under one large state. Each county handles their prosecutions differently. Right, but what was unusual here is that you have a joint task force. Yes, there is a joint task force here. But there was no one from the Flathead County Sheriff's Office who was a member of the joint task force. I was just told that there was. Was that wrong? She just said that one of the people on this case. There is a member on this joint task force. But there's no evidence in the record that that member was working on the Leptich-Sanchez drug aspect of the drug case. The Montana Supreme Court gave other reasons as well, though, including that the evidence at issue had what they called very little value to the defense because it was inadmissible, speculative, and only served to attack Sanchez's character. Is that reasonable or unreasonable in your view? That's a reasonable finding by the Montana Supreme Court. I think this whole thing about what would have come out about Sanchez. Was evidence of his propensity for violence and his drug dealing, did that come out at the trial? At trial, I think the jury was well aware that he was a drug dealer. He said that he sold a lot of drugs in Montana, and there was a lot of money made with those drugs. The jury also knew that he carried a 9mm gun around with him. The jury knew he was from Yakima, Washington. There was testimony. Was there a theory at trial, or is the argument that there could have been a theory at trial, that he was behind the murder? Is that what's going on here, or is it an attempt to impeach him for what he did testify to? Was it argued at trial that the real culprit here is Sanchez? Was that an argument made? That was one of their points along with other ones, that this Mexican mafia, which Sanchez was part of, which they suggest Sanchez was part of because he was from Yakima, Washington, which brings me back to the point. The jury knew that Sanchez was a drug dealer, that he moved a lot of drugs in Montana with a lot of money, that he carried a gun. I don't think it's a stretch for the jury to understand. And that he was there that day. That he was there that day, that a person who sells a lot of drugs could also be violent. I don't think this testimony from Lethbridge would have really changed the jury's mind. Regarding the St. Ignatius Police Report, because that's part of this whole Sanchez question, the St. Ignatius Police Report was from November of 2000. The homicides occurred in this case in July of 2001. The St. Ignatius Police Report could not have been part of this investigation, or the Flatter County Sheriff's Office could not have requested that police report because it predated the homicides by eight months. I don't understand that point. Well, they're saying somehow that this St. Ignatius Police Report was made as part of the investigation in this case when it predated the homicides by eight months. So it could not have been a requested part of the investigation here. And besides, there's no evidence in the record that anyone from Flatter County, be it prosecutor or investigators, knew about that St. Ignatius Police Report. What was in the St. Ignatius Police Report? Pardon? What was in that report? That was the dispatch report from Sanchez's girlfriend, the mother of Sanchez's child, in which she said that Sanchez threatened them. Now, switching over to Armstrong, was Armstrong the best government witness in the case, the strongest government witness? Well, he was one of the best. Well, he's the one who wrote the confession. Yeah, but so did Edwardson. And Edwardson doesn't have, quote-unquote, all the baggage that Armstrong had. Well, let's go back to Armstrong then. The two Brady pieces there are the notes, the jail notes. Now, those were produced, but there was some labeling or description of those notes, and the other one was the mother's testimony in another case. What's your view of those issues? Well, there's no Brady violation, as the Montana Supreme Court found, because they made those notes available. And I think when you're under EPPA here, you have to determine whether that finding is reasonable. Now, McGarvey's arguing that the prosecutor's statement somehow misled his counsel not to read those notes. But for that argument to stand, McGarvey has to show his counsel did not read those notes, and the record indicates that counsel perhaps read the notes. And I'm looking at ER-2. This is the post-conviction hearing from April 25, 2011, page 254. This is the questioning of McGarvey's trial counsel, Greg Jackson. Now, McGarvey had two attorneys, Greg Jackson and Don Barnett, and Jackson is asked, but you don't recall specifically whether you looked at them, meaning the jail notes. And this is Jackson's answer. You know, I'm assuming we did, but I have no independent recollection at this time. I mean, I can't imagine we would not have. I mean, I always look at those things. So the record indicates that counsel did look at those two jail notes. They were available to him. So there is no Brady violation regarding the Armstrong jail notes. Now, when you get to Susan Fox's testimony, the Montana Supreme Court, in analyzing this, did add this diligence requirement. And that's an unreasonable application of Brady because there is no diligence requirement. But the Montana Supreme Court denied the Brady claim regarding the Fox's testimony and Fox's sentencing letter also on materiality grounds. And that materiality issue is entitled to ad pedephris. Now, the magistrate judge and the federal district court judge did not give ad pedephris to that issue. But I think that the United States Supreme Court's holding in Wetzel v. Lambert would require a federal district court to give that ad pedephris to that. And the Montana Supreme Court's determination that the evidence was not material is not unreasonable. Now, at the state post-conviction proceedings, trial counsel Don Varney said the strategy was to show, as the court recited earlier, that Armstrong was a liar, a thief, an extortionist, and a drunk. And they accomplished all those tasks. In light of that cross-examination, it's unlikely that Fox's testimony about McGarvey being forgetful would have created a reasonable probability of a different syndrome. Armstrong being forgetful. Armstrong being forgetful. Okay. Excuse me. There's all these names. Now, McGarvey has argued that Fox's testimony at the sentencing hearing in her letter was important because it would have shown that Armstrong was forgetful or he somehow made up hearing McGarvey's recitation of the confession. Well, if you look at the core facts of the crime in each of Armstrong's statements and in his trial testimony, they're consistent. There's no memory problem with Armstrong. They're all consistent throughout. And Armstrong's testimony is supported by the facts at the scene. They back it up. And perhaps the most telling thing is that Edwardson corroborates what Armstrong said as far as the confession. What they're saying about the confession is generally the same. The fact that you have Edwardson also hearing ---- And was that information not public information at the time they were giving him, what Armstrong and Edwardson said about the crime? About the crime? Yes. Certain parts of it were public information, but others weren't. For instance, things that were not public were the fact of how each Grant and Nelson were shot. Okay? The confession by McGarvey says that Grant came at him with a gun. He wrestled the gun away from him and that he shot Grant when they were wrestling from the gun. Well, you have gunpowder residue evidence, forensic evidence, that shows that two of the shots were at close range, which supports a theory, which supports a testimony that the shooting occurred during a wrestling match. The other person, Nelson, McGarvey says, is, I shoot him when he's running away. There's no gunpowder residue shots on Nelson's body. Other things that match up to the physical evidence are the fact that McGarvey says that Grant came at me with his gun, I took the gun away and shot Grant and then shot Nelson. Well, there's a .357 caliber handgun missing from Grant's house. The forensic evidence shows that the bullets used in this crime came from either a .38 or a .357, just like the gun, and that the same gun was used to kill both persons, Grant's gun, and that the bullets that were recovered from Grant's body and from the car were a rounded-type bullet. Well, lo and behold, inside of Grant's house, there is six missing bullets out of a case, these same type of rounded bullets. But let me try to return to the Brady issue on Edwardson, which is one we have not talked about. When did the information concerning Edwardson and Monroe come about? Did that come about before the trial? That came about before the trial, but the methamphetamine operation that Edwardson and Monroe were running occurred after Edwardson gave his account of McGarvey's confession to the police. So Monroe could not have been using their methamphetamine operation to somehow coerce Edwardson to give a fabricated account of McGarvey's confession because it hadn't been even in place. So why wasn't that disclosed, the Edwardson-Monroe relationship? I just, it was disclosed, it was disclosed that Edwardson was charged with this offense. I don't, I just think, I just don't think the State thought it was exculpatory. There's nothing in the record showing why. And, you know, when you have a Brady, when you have a Brady violation, it has to be based on something more than speculation, particularly when you're in habeas review because you have this additional dose of deference you have to apply. The other thing is that it would have seemed to be a lot more pertinent if Monroe testified at trial, but he didn't. No, Monroe didn't testify at trial. And the jury heard about this testimony that Edwardson, that Edwardson went to Monroe's, saw Monroe, and then put Monroe at the scene. They heard about the statement at trial. Monroe, Edwardson testified that Monroe wasn't there, and the reason why he went forward because his sister, who he thinks highly of, told him to tell the truth. I see my time is up. Thank you. If there's no further questions. I don't believe so.  Thank you. Ms. Holton. Thank you, Your Honors. Several points. Parrish was one of the Flathead County investigators who went to Lake County to interview Sanchez and Leptich. They didn't keep any records of the interview of Leptich. Without the information on Sanchez, the defense counsel didn't have a factual basis to cross-examine him. So that's my question. Was the point of the Sanchez concern, A, that he was lying about what he did testify to, or, B, that he could have been more effectively set up as an alternative shooter? I think it's B, because that was the defense theory of the case, and there was substantial information in the discovery to support that. And the difference would have been, even if both pieces came in, that he had threatened his wife and that he was a bigger drug dealer than he said. And that he used violent means to collect. But that seemed hard to admit. I mean, what did you have about that? You had somebody, you don't have any direct evidence of that. Well, you've got Mary Leptich and Marie Opal Matz saying, talking, I think it was Ms. Matz's mother, talking about how he was joking about Barney Salloway, who ended up in the hospital. He had previously said, I'm going to get my money from Barney one way or the other, and that Barney the next day ends up in the hospital, and then he's joking about saying. Is that admissible? If you were able to cross-examine him and say, Mr. Sanchez, you've used violent means to collect money, and he says, oh, no, I would never, you know, if I have a bad debt, I don't worry about it. And you say, well, what about these things you said about Barney Salloway? And you could bring in both of those witnesses, then, if he denied it, to impeach him. Thank you, counsel. Thank you, Your Honor. The question is submitted, and we appreciate very much the helpful comments from both of you, and we will take a break for about 10 minutes.
judges: Graber, Berzon, Robreno